**Benny Lee SAYLOR, Appellant–
Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 48S00–9301–DP–6.

Supreme Court of Indiana.

Sept. 19, 1997.

Rehearing Denied Dec. 3, 1997.

Jeffrey A. Lockwood, Mitchell P. Chabraja, Anderson, for Appellant–Defendant.

Jeffrey A. Modisett, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianopolis, for Appellee–Plaintiff.

BOEHM, Justice.

A jury convicted Benny Lee Saylor of murder, murder in the commission of a robbery, robbery, and confinement. Following the sentencing phase of the trial, the jury recommended that the death penalty not be imposed. The trial court, finding that the aggravating circumstances outweighed any mitigating circumstances, declined to follow the jury recommendation and imposed a death sentence. In this direct appeal, Saylor raises nine issues for our review that we consolidate and restate as follows:

1. Did the trial court abuse its discretion in denying Saylor's motion for mistrial based upon the State's use of criminal background checks on potential jurors?

2. Did the trial court properly decline Saylor's request for an instruction on the possibility of a sentence of life imprisonment?

3. Was the evidence sufficient to support Saylor's conviction for robbery?

4. Was the evidence sufficient to support Saylor's conviction for confinement?

5. Did the trial court err in imposing the death penalty?

We affirm.[1]

### Factual and Procedural Background

At approximately 10 p.m. on June 17, 1992, Judy VanDuyn drove in the family van to a laundromat in Anderson, Indiana. That night, a severe storm hit the Anderson area, causing power outages and property damage. Just after midnight, the owner of the laundromat received a call from an unidentified woman complaining that the machines had stopped. The owner arrived at the laundromat ten minutes later and found no one, but did find clothes left in some of the washers. He did not see any vehicles in the front parking lot. He determined that there was a power outage and decided to lock up and go home. As he left, he noticed a red car parked at the side of the building.

When Judy had not returned home by 3:30 a.m., her husband, Paul VanDuyn, became worried and went to search for her. He arrived at the laundromat at approximately 4:25 a.m. and found the door locked. He thought he recognized some of the family's laundry inside the dimly lit building. As he was leaving the laundromat, he noticed a red Chevrolet Cavalier parked at the side of the building and wrote down a description and the license plate number on a bank envelope. He then returned home and reported his missing wife to the police. At 8 a.m., Captain Mark Thompson and Detective Robert Blount of the Madison County Sheriff's Department arrived · at the VanDuyn home. They informed Paul that his wife had been a victim of a homicide. Paul gave them the bank envelope with description and the license number of the car he saw parked at the laundromat. Thompson ran a check on the license number and discovered that the car's owner was Benny L. Saylor of Anderson, Indiana.

Some hours before midnight on the night of Judy's death, Saylor, Jayke Herdon, and Frederick VanHorn were driving around trying to find some marijuana. The three men

eventually ended up at Saylor's home where they smoked marijuana and drank liquor. Sometime during the evening, each of the men took Xanax pills, an anti-anxiety drug. According to Saylor's testimony, he and Van-Horn later took some LSD. Around midnight, Saylor drove to the laundromat to obtain change to buy a drink.

At about 1 a.m. the same night, David Conrad was surveying the area around his farm for storm damage and found a van in a nearby field. Two people were in the van, a woman in the driver's seat, and a man, later identified as Saylor, in the passenger seat. When Conrad asked the woman if there was a problem or if she needed help, she indicated that she did not. At about 2 a.m., Gary Allen Gibson also went out to check for storm damage and came across the van. He looked inside the van and discovered Judy's body lying on the floor between the seats. After telling a neighbor to call the police, Gibson attempted to perform CPR but stopped because Judy's body felt cold and was covered with blood. The police found Judy's purse in a nearby field and footprints leading to a road. An autopsy revealed that Judy had been stabbed or cut approximately forty-five times. There were twenty-eight wounds to her left breast alone.

Later that morning, police officers followed up on the information received from the license plate check and went to Saylor's home. A red Chevrolet vehicle, with a license plate number matching the one given by Paul Van-Duyn, was parked in the driveway. The officers went to the door and asked for Saylor, who then came to the door. They noticed a wound on his temple, dried blood in his hair, a cut on his finger, and numerous cuts and abrasions on his arms. He matched the description provided to the police by David Conrad. After reading Saylor his *Miranda* rights, they questioned him about his whereabouts during the night. Saylor said he had taken VanHorn home at 12:30 a.m. and then went straight home. He said the injury to his temple might have been from a fight with VanHorn. When the officers

---

1. In his brief, Saylor raised three issues regarding electrocution that we need not address because they are moot. In 1995, the legislature replaced electrocution with death by lethal injection. IND.CODE § 35–38–6–1(a) (Supp.1995).

asked additional questions about his injuries, Saylor requested an attorney and they stopped all questioning. One officer testified that he did not believe Saylor was under the influence of drugs or alcohol at that time.

Saylor was arrested and taken to the Madison County Jail. At the jail, police searched Saylor and found twenty-two dollars in wet currency and a soaking wet billfold. The police then executed a search warrant at Saylor's house. They found a pair of wet tennis shoes and soaking wet jeans that appeared somewhat pinkish. Later that day, David Conrad viewed a line-up at the jail and positively identified Saylor as the person he had seen in Judy's van the night before. Saylor was subsequently charged with murder, murder in the commission of a robbery, robbery, and confinement.

While incarcerated and awaiting trial, Saylor told Richard Herche, another inmate, several details about the crime. Herche testified that Saylor told him that he had seen Judy in the laundromat and decided to rob her when she brought her clothes out to the van, and that he used a knife to force her to get into the van and drive away.

In January 1994, a jury found Saylor guilty of all four counts. The trial court then imposed the death penalty after considering the jury's recommendation against it. Saylor appealed to this Court. On October 15, 1996, this Court remanded this case to the trial court to reconsider its sentencing order in light of recent developments in Indiana's death penalty law.[2] On December 2, 1996, the trial court issued a new sentencing order once again imposing the death penalty. Saylor now appeals from that order.

## I. Criminal Background Checks

■ Saylor contends he is entitled to a new trial because the State conducted criminal background checks on potential jurors. When Saylor became aware that the State

may have been using this information in questioning potential jurors, Saylor asked the court to discharge all jurors previously selected or to declare a mistrial. The trial court denied Saylor's motion but stated that it would entertain a discovery request by Saylor for the information. The record does not disclose any such discovery request.

■ Saylor's contention fails for two reasons. First, he does not cite authority from any jurisdiction to support his argument. Ind. Appellate Rule 8.3(A)(7). Second, and more importantly, he fails to explain how the State's use of the criminal background checks prejudiced his interests. The State noted that no juror had been challenged due to its record checks. Rather it had relied upon information provided on the juror questionnaires and gained during voir dire to challenge the jurors. Furthermore, Saylor's assertion that he was denied due process because the State had access to information not available to him is similarly unpersuasive. The trial court stated that it was willing to entertain a discovery request for the information, thereby alleviating any prosecutorial advantage. In light of the above factors, we find no error here.

## II. Life Imprisonment Instruction

■ Saylor next argues that the trial court's failure to instruct the jury that a sentence of life imprisonment is an alternative to the death penalty violated his rights under the Equal Protection Clause of the United States Constitution and Article I, Section 23 of the Indiana Constitution. The State correctly responds that this Court resolved this precise issue in *State v. Alcorn,* 638 N.E.2d 1242 (Ind.1994), *reh'g denied.*

Saylor's argument stems from 1993 amendments to Indiana Code § 35–50–2–3(b) that allowed a trial court to sentence a defen-

---

**2.** Saylor was initially sentenced on February 17, 1994. In that sentencing order, the trial court considered non-statutory aggravating circumstances, including victim impact evidence, in determining that the death penalty was appropriate. Later that year, we decided *Bivins v. State,* 642 N.E.2d 928, 953–57 (Ind.1994), which addressed that very issue and held that a death penalty decision must be based exclusively upon

the statutorily enumerated capital sentencing aggravating circumstances. We expressly held that *Bivins* was applicable to all cases pending on direct review. *Id.* at 956. The original sentencing order also showed that the trial court applied an improper standard in evaluating the intoxication mitigating circumstance. The new sentencing order rectifies these issues and reflects the changes in the law.

dant convicted of murder to life imprisonment without parole or to death. The legislature similarly amended Indiana Code § 35–50–2–9(e), to allow the jury to make a recommendation of life imprisonment without parole or the death penalty in murder cases. The legislature specifically provided that these amendments applied to murders committed after June 30, 1993. 1993 Ind. Acts, P.L. 250, § 3. In *Alcorn*, the defendant was charged with murder in 1991 prior to the statutory amendments. This Court held that the trial court had no authority to apply the new statute in that case, because the statute by its own terms was inapplicable to crimes committed prior to June 30, 1993. *Alcorn*, 638 N.E.2d at 1246. In so doing, this Court explicitly rejected Alcorn's equal protection challenge to the statute's savings clause. *Id.* at 1244–45.

As in *Alcorn*, Saylor was charged with a crime that occurred prior to June 30, 1993. Therefore, we reaffirm our holding in *Alcorn* and conclude that Saylor was not entitled to a life imprisonment instruction.

### III. Sufficiency of the Evidence—Robbery

Saylor next contends there was insufficient evidence to support his conviction for robbery, a Class B felony.[3] When reviewing a claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Isaacs v. State*, 673 N.E.2d 757, 764 (Ind.1996). We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* The conviction will be affirmed if evidence of probative value exists from which a jury could find the defendant guilty beyond a reasonable doubt. *Id.*

■ In his brief, Saylor argues that "[t]he evidence of robbery is wholly circumstantial." A few sentences later, he declares: "There is no proof, by either direct or circumstantial

evidence, that Benny Saylor took any money from Judy VanDuyn." When a verdict rests on circumstantial evidence, this Court need not find that the circumstantial evidence is adequate to overcome every reasonable hypothesis of innocence, but only that inferences may reasonably be drawn to enable the jury to find guilt beyond a reasonable doubt. *Davis v. State*, 598 N.E.2d 1041, 1045 (Ind. 1992), *reh'g denied, cert. denied*, 510 U.S. 948, 114 S.Ct. 392, 126 L.Ed.2d 340 (1993). Thus, if a reasonable inference can be drawn from the circumstantial evidence, the verdict will not be disturbed. *Green v. State*, 587 N.E.2d 1314, 1315 (Ind.1992).

■ Saylor first attacks the conviction because the State never produced a knife or other sharp object. The record reveals that VanHorn, a friend of Saylor's, testified that Saylor kept a knife in the car he was driving the night of the crime. Herche, a fellow inmate at jail, testified that Saylor said he had seen Judy in the laundromat and "was going to rob her."[4] Herche also testified that Saylor said he "took a knife and told her to get in the van and take off." The jury could reasonably infer from this testimony that Saylor was armed with a sharp object.

Saylor also attacks the conviction because no one saw him take anything from the victim. The record reveals that Judy had cashed a check for fifty dollars prior to going to the grocery store and the laundromat. Her husband testified that she likely spent twenty to twenty-two dollars at the grocery store. In a muddy field near the crime scene, the police found Judy's purse containing approximately five dollars in change and a one dollar bill next to it. When Saylor was arrested, the police searched him and found twenty-two dollars in wet currency. Wet tennis shoes and soaking wet jeans were found at Saylor's home. The wetness of the

---

**3.** The Indiana Code states that a person commits robbery, a Class B felony, when one "knowingly or intentionally takes property from another person ... (1) by using or threatening the use of force on any person; or (2) by putting any person in fear" while armed with a deadly weapon. Ind.Code § 35–42–5–1 (1988).

**4.** In his reply brief, Saylor urges us to render Herche's testimony incredible as a matter of law

because jail logs indicated they were not in the same location when Herche claims he had this conversation with Saylor and because one police officer did not see them in the same location. It is within the province of the jury to determine which testimony to believe. We decline Saylor's invitation to reweigh the evidence or judge the credibility of the witnesses. *Isaacs*, 673 N.E.2d at 764.

currency and his clothing is consistent with his running through the wet grass and fields after a severe storm. This evidence would clearly allow the jury to infer that Saylor took money from the victim. Accordingly, the evidence is sufficient to support Saylor's conviction for robbery.

## IV. Sufficiency of the Evidence— Confinement

■ Saylor next asserts that the evidence was insufficient to support his conviction for confinement, a Class B felony.[5] Saylor again argues that the evidence of confinement is "wholly circumstantial." However, Saylor confessed to Herche that he saw the victim in the laundromat and he took his knife and forced her to get into the van. A defendant's confession of a crime is direct, not circumstantial, evidence. *Stahl v. State*, 616 N.E.2d 9, 11–12 (Ind.1993). Moreover, David Conrad testified that he approached the van while it was parked in the field and saw Judy and a man later identified as Saylor. He testified that he briefly spoke with Judy and asked if she needed help. She told him that she did not, but Conrad believed she appeared nervous. From this evidence, the jury could have reasonably concluded that Judy did not voluntarily accompany Saylor but that he confined her at knife point. Therefore, the evidence was sufficient to support Saylor's conviction for confinement.

## V. Death Penalty

Saylor presents three principal arguments in support of his contention that the trial court erred by imposing the death penalty: 1) the trial court failed to give sufficient consideration to mitigating factors; 2) the trial court failed to give sufficient consideration to the jury's recommendation against the death penalty; and 3) imposition of the death penalty violated Article 1, Sections 16 and 18 of the Indiana Constitution.

### A. Consideration of Mitigating Factors

In determining a capital sentence, the trial court must: 1) find that the State has proved beyond a reasonable doubt that at least one of the aggravating circumstances in the death penalty statute exists; 2) determine that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances; and 3) consider the jury's recommendation. IND.CODE § 35–50–2–9(e) (Supp.1990) (now codified at Indiana Code §§ 35–50–2–9(e) and (k)).

In this case, the trial court determined that the State had proved two death penalty aggravating circumstances beyond a reasonable doubt: 1) Saylor intentionally killed the victim while attempting to commit a robbery; and 2) at the time the murder was committed, Saylor was on probation after receiving a sentence for burglary. In the sentencing order, the trial court noted each of the eight mitigating circumstances listed in Indiana Code § 35–50–2–9(c). After discussing each circumstance in detail, the court expressly found that "none of the mitigating circumstances in I.C. 35–50–2–9 were proven or established in this case." Saylor does not challenge the court's finding of aggravating circumstances, but instead argues that there were several mitigating circumstances supported by the record that should have been considered by the court.[6]

■ A trial court is under no obligation to find that a mitigating circumstance exists simply because it is supported by some evidence in the record. *Bivins v. State*, 642 N.E.2d 928, 952 (Ind.1994), *reh'g denied, cert. denied*, 516 U.S. ——, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996). Moreover the trial court

---

5. A person commits confinement, a Class B felony, when one "knowingly or intentionally: (1) confines another person without the other person's consent; or (2) removes another person, by fraud, enticement, force, or threat of force, from one (1) place to another" while armed with a deadly weapon. IND.CODE § 35–42–3–3 (Supp. 1989).

6. Saylor also claims that there is no evidence to support the trial court's finding that the victim

"was tortured, or at least, sadistically murdered." First, the trial court made that statement to show that one of the mitigating circumstances (the victim was a participant in or consented to the defendant's conduct) was inapplicable. It was not used as an aggravating circumstance. Second, there is detailed testimony of a pathologist that supports such a remark. Thus, we find no error here.

is not obligated to credit or weigh the defendant's evidence of mitigating circumstances the same way the defendant does. *Id.* However, the trial court's failure to find mitigating circumstances that are clearly supported by the record may imply that they were overlooked and not properly considered. *Id.; see also Widener v. State,* 659 N.E.2d 529, 534 (Ind.1995).

■ In this case, the alleged additional mitigating circumstances were not clearly supported by the record. First, Saylor argues that the trial court ignored evidence that he could behave and work well in a structured environment and would respond affirmatively to confinement. This evidence was not "clearly supported by the record" as required by *Bivins.* For example, during the sentencing phase of the trial, three witnesses testified that Saylor was a good worker at the prison commissary. However, each one also testified that he had been written up and disciplined for an infraction.

Saylor also contends the trial court ignored the mitigating factor that he had a chemical dependency and was susceptible to substance-induced blackouts. The trial court devoted significant discussion to this potential mitigating factor in its revised sentencing order. Saylor's own witness testified that he did not believe Saylor suffered from a mental disease. Dr. Eric Engum, a clinical neuropsychologist, stated that he "[did] not believe that Benny Saylor suffers from a mental disease or defect that emanates from an organic, like brain damage issue, or that emanates from a psychological factor, such as schizophrenia or manic depressive psychosis." The evidence did show that Saylor had consumed alcohol and ingested drugs on the day and night in question. Dr. Engum believed that Saylor was substantially impaired on the night in question due to his consumption of a large amount of drugs and alcohol. However, there was conflicting evidence regarding Saylor's level of intoxication. The trial court noted that Saylor was able to formulate a clear pattern of abduction, avoidance of detection, and escape. This was indicated by his parking his car at the side of the laundromat, taking the victim to a country road, and returning to Anderson, more than six miles away from the crime scene. Saylor was able to drive his car during a very severe storm. His mother testified that she saw him at 6 a.m. and did not believe that he was intoxicated. Additionally, the police officers who questioned him and took him into custody at 9 a.m. did not smell alcohol or see any actions indicating intoxication. This evidence was not so clearly supported by the record as to lead us to conclude that these factors were overlooked and hence not properly considered by the trial court. *Bivins,* 642 N.E.2d at 952. Therefore, because the evidence regarding these alleged mitigating circumstances is at best conflicting, we find no error in the trial court's refusal to accept them.

■ Saylor further argues that the trial court ignored evidence that he was subjected to a non-nurturing family environment including sexual, substance, and physical abuse. However, the sentencing order specifically discusses the conflicting evidence of his troubled childhood and then rejects this alleged mitigating circumstance. The trial court was able to observe personally each witness, judge his or her credibility and take all of the facts into consideration. While such circumstances, particularly the defendant's difficult experiences in childhood and adolescence, may have been sufficient to be recognized as a mitigating circumstance to be weighed, the trial court was not under an obligation to do so. *Lowery v. State,* 547 N.E.2d 1046, 1059 (Ind.1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 217, 112 L.Ed.2d 176 (1990). Because the trial court need not afford this circumstance the same weight as the defendant does, we find no error. Accordingly, we conclude the trial court properly followed the requirements of our death penalty statute.[7]

---

7. In his original brief, Saylor argued that the trial court erroneously considered victim impact evidence. The revised sentencing order does not reflect consideration of such evidence and Saylor does not raise any issues concerning that evidence in his supplemental brief. Thus, any issues regarding victim impact evidence are not now before us.

### B. The Trial Court's Consideration of the Jury Recommendation

Saylor argues that the trial court failed properly to consider the jury's recommendation that the death penalty not be imposed. Pursuant to the death penalty statute, "[t]he court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider." IND. CODE § 35–50–2–9(e) (Supp.1990). Our legislature specifically declared that the "court is not bound by the jury's recommendation." *Id.* This Court has stated that when the trial court has a jury recommendation against death before it, the single essential feature of this part of the sentencing process is that at the point of final decision the court reflect upon the jury recommendation against imposing death. *Roark v. State*, 644 N.E.2d 565, 570 (Ind.1994), *reh'g denied.*

Saylor asserts that the trial court's sentencing order lacks a clear statement of the weight the trial court gave to the jury's recommendation. The United States Supreme Court recently rejected a defendant's suggestion that a trial judge must give "great weight" to the jury's advice. *Harris v. Alabama*, 513 U.S. 504, 511–12, 115 S.Ct. 1031, 1035–36, 130 L.Ed.2d 1004 (1995). In addressing the defendant's claim that the advisory jury scheme violates the Eighth Amendment, the Court held: "The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight." *Id.* at 515, 115 S.Ct. at 1037. The Court also recognized that there is no reason to expect that advisory verdicts will be treated uniformly in every case. *Id.* at 514, 115 S.Ct. at 1036–37. "The disparate treatment of jury verdicts simply reflects the fact that, in the subjective weighing process, the emphasis given to each decisional criterion must of necessity vary in order to account for the particular circumstances of each case." *Id.* at 515, 115 S.Ct. at 1037 (citation omitted).

In *Peterson v. State*, 674 N.E.2d 528 (Ind. 1996), *reh'g denied,* where the defendant had been convicted of two killings, we said that the jury recommendation against death

> is particularly significant because this is the same jury that unanimously found the defendant guilty of two murders and were prepared to accept their role in rejecting the State's request for the death penalty. The jury's recommendation reflects a statement by the "conscience of the community."

*Id.* at 543 (citation omitted). Just as in *Peterson*, the trial court is obliged to recognize the particular significance of the jury recommendation against death here. However, as in *Peterson*, the trial court gave careful and extensive consideration to the jury's recommendation and articulated reasons for not following it. Furthermore, the trial court's sentencing proceeded in strict conformity with the standards applicable to capital cases and the jury here made a finding of intentional killing.

In this case, the sentencing order reflects that the trial court specifically noted the critical role of juries in Indiana's death penalty proceedings and the invaluable nature of a jury recommendation. The order demonstrates the court's understanding that the recommendation was important but not dispositive. In the trial court's view, given the nature and circumstances of this offense "the jury's recommendation that the death penalty should not be imposed was an insufficient response in this case and clearly unreasonable." The trial court's approach conforms to both (a) the Indiana statutory requirement of trial court consideration of the jury's recommendation, IND.CODE § 35–50–2–9(e); *Roark*, 644 N.E.2d at 570; and (b) the federal constitutional requirement of an individualized sentencing determination on the basis of the character of the individual and the circumstances of the crime. *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235, 251 (1983) (citing cases). Accordingly, we find the trial court's carefully drafted sentencing order, in declining to follow the jury's recommendation and imposing the death penalty, demonstrates compliance

with Indiana's death penalty law and the decisions of this Court.

### C. Constitutionality of Indiana's Death Penalty

▮ Saylor argues that Indiana's death penalty advisory jury system violates Article 1, Sections 16 and 18 of the Indiana Constitution.[8] He asserts that Indiana's death sentencing scheme is troublesome due to its highly subjective nature. He concedes that there is authority contrary to his position, yet fails to explain how this procedure constitutes disproportionate punishment or vindictive justice. This Court has consistently rejected the argument that Indiana's statutory death penalty procedures, and in particular the procedures for a non-binding jury recommendation, violate either Section 16 or Section 18 of Indiana's Constitution. *Peterson*, 674 N.E.2d at 541–42. We reaffirm that the advisory jury scheme does not offend these constitutional provisions.

Once again acknowledging firmly established precedent to the contrary, Saylor argues that the death penalty per se violates Article 1, Section 18. This argument has been considered and rejected by this Court, both shortly after the adoption of our current Constitution and quite recently. *Harrison v. State*, 644 N.E.2d 1243, 1258 (Ind.1995) (citing *Driskill v. State*, 7 Ind. 338, 342, (1855); *Rice v. State*, 7 Ind. 332, 338 (1855); *Fleenor v. State*, 514 N.E.2d 80, 90 (Ind.1987), *reh'g denied, cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988)), *aff'd after remand*, 659 N.E.2d 480 (Ind.1995), *reh'g denied, cert. denied*, 517 U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). We decline Saylor's invitation to revisit this issue today and reaffirm these holdings.

### D. Independent Consideration of Jury Recommendation

Article VII, Section 4 of the Indiana Constitution gives this Court "the power ... to review and revise the sentence imposed" in any criminal appeal. Meaningful appellate review of death sentences plays a crucial role in ensuring that the death penalty is not imposed arbitrarily or irrationally.[9] *Id.* at 1260 (citing *Parker v. Dugger*, 498 U.S. 308, 321, 111 S.Ct. 731, 739–40, 112 L.Ed.2d 812 (1991); *Gregg v. Georgia*, 428 U.S. 153, 204–06, 96 S.Ct. 2909, 2939–41, 49 L.Ed.2d 859 (1976)). The United States Supreme Court emphasized that during the review process, it is important for state supreme courts to conduct "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Parker*, 498 U.S. at 321, 111 S.Ct. at 739 (internal quotation marks and citations omitted) (emphasis in original).

▮ In *Peterson*, we clarified this Court's role in reviewing cases where the jury recommends against a death penalty but the trial court ultimately declines to follow the recommendation and imposes a death sentence. We independently consider the jury recommendation against death and determine whether the death penalty is appropriate. *Peterson*, 674 N.E.2d at 540. In determining whether the penalty is appropriate, we consider not only the application of the statutory aggravating and mitigating factors, and whether the former outweigh the latter, but also the consistency of the penalty with other death penalty cases in this state. *Id.* at 543. Ultimately, this review must involve

---

**8.** Indiana Constitution, Article 1, Section 16 requires that "[c]ruel and unusual punishments shall not be inflicted" and "[a]ll penalties shall be proportioned to the nature of the offense." Article 1, Section 18 states: "The penal code shall be founded on the principles of reformation, and not of vindictive justice."

**9.** The United States Supreme Court has emphasized the importance of maintaining consistency among cases in which the death penalty has been imposed. "If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that

can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Parker v. Dugger*, 498 U.S. 308, 321, 111 S.Ct. 731, 739, 112 L.Ed.2d 812, 826 (1991) (internal quotation marks and citation omitted). The Court also noted previous holdings that a state supreme court's independent review of death sentences minimizes the risk of constitutional error and provides "crucial protection" in cases where the trial court does not follow the jury's recommendation against death. *Id.* (citing cases) (internal quotation marks omitted).

a judgment as to a variety of factors not capable of precise mathematical ordering.

Upon our independent review, we find that the State proved beyond a reasonable doubt the two aggravating circumstances noted by the trial court: 1) Saylor committed murder by intentionally killing the victim, Judy VanDuyn, while committing robbery; and 2) at the time the murder was committed, Saylor was on probation after receiving a sentence for the commission of a felony. As mitigating circumstances, we find evidence of defendant's troubled childhood, which may have included sexual, physical, and emotional abuse, his having consumed some alcohol and drugs at the time of the offense, and his history of substance abuse. Unfortunately, this combination of factors is not uncommon. The mitigating weight, if any, warranted for these considerations is "in the low range, individually and cumulatively." *Id.* at 543.

We specifically note that the jury recommended against the death penalty. Indeed, the jurors heard the testimony and saw photographs of the graphic details of this terrible crime, yet advised the trial court not to sentence the defendant to death. Nevertheless, the legislature vests the trial court with final authority for determining sentences in capital cases subject to this Court's power to "review and revise" sentences. IND. CONST. art. VII, § 4. In this respect, the penalty here is very similar to the one imposed in *Peterson,* where we found similar mitigating circumstances to be of low weight and clearly outweighed by the aggravating circumstances. This case is unlike *Schiro v. State,* 669 N.E.2d 1357 (Ind.1996), *reh'g denied,* where the jury never reached the conclusion that the defendant intended to kill the victim. To the contrary, in this case the jury convicted Saylor of both intentional murder and felony murder. Nor does this case present circumstances or facts such as those that made the jury recommendations against death persuasive notwithstanding the trial court's conclusion to the contrary. *See, e.g., id.* at 1359; *Roark,* 644 N.E.2d at 572; *Kennedy v. State,* 620 N.E.2d 17, 19–20 (Ind. 1993); *Jackson v. State,* 597 N.E.2d 950, 956 (Ind.1992); *Martinez Chavez v. State,* 534 N.E.2d 731, 735 (Ind.1989), *reh'g denied,* 539 N.E.2d 4 (Ind.1989).

After giving due consideration to the jury's recommendation, we determine that the death penalty is appropriate under the statute. This sentence is proportionate not only to the nature of the offense but also to the sentences approved for other capital murder defendants in other Indiana cases.

### Conclusion

We affirm Saylor's conviction for murder and all other convictions and find that Indiana's death penalty statute was fully complied with. The death sentence is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.